IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FLYING J INC., et al.,<br><br>        Plaintiffs,<br><br>  vs.<br><br>TA OPERATING CORPORATION, et al.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PETRO STOPPING CENTERS, L.P.'S MOTION TO DISQUALIFY COUNSEL AND GRANTING PLAINTIFFS' MOTION TO STRIKE THE DECLARATION OF THOMAS D. MORGAN**<br><br>Case No:  1:06-CV-30 TC<br><br>District Judge Tena Campbell<br><br>Magistrate Judge David Nuffer |

      Petro Stopping Centers, L.P. ("Petro"), a non-party to this litigation, has filed a motion to disqualify Gibson, Dunn, & Crutcher LLP ("Gibson Dunn"), as counsel for Plaintiffs in this case.[1]  For the reasons discussed below, the court denies the motion.

## BACKGROUND

      Petro states that "[f]rom April 1999 until February 9, 2007, Gibson Dunn served as Petro's primary outside counsel on corporate governance, financing and restructuring issues,

---

[1]Docket no. 134, filed July 27, 2007.

regulatory compliance, investor relations, and antitrust matters."[2]  During this eight-year period, Petro paid Gibson Dunn approximately $3.4 million.[3]

Over the same time period, Gibson Dunn also represented Flying J, one of the plaintiffs in this case.  In 1997, Flying J hired Gibson Dunn to represent it as lead counsel in an antitrust lawsuit in this court captioned *Flying J Inc. v. Comdata Network, Inc.*[4] (the "Comdata litigation").[5]  The Comdata case involved antitrust and tort claims, including claims that Comdata was monopolizing the trucker fuel card market.[6]  In May 2001, the parties reached a settlement in the Comdata case.[7]  The conflict soon resumed, however, when Flying J became concerned that Comdata was not honoring the terms of the licenses that were part of the settlement agreement. In May 2002, Flying J filed a motion to enforce the agreement.[8]  From 1997 to the present, the total legal fees paid by Flying J to Gibson Dunn for its work on just the Comdata litigation, including enforcement of the settlement agreement, is nearly $6.3 million.[9]

---

[2]Howell Decl.  ¶ 2, docket no. 136, filed July 27, 2007.

[3]*Id.*

[4]1:96-CV-66 BSJ

[5]Kerwin Decl. ¶ 4, docket no. 166, filed August 29, 2007.

[6]See Plaintiffs' Memorandum in Opposition to TA's Motion to Disqualify Plaintiffs' Counsel ("Opposition") at iii, docket no. 163, filed August 29, 2007.

[7]*Id.* at vi.

[8]*Id.* at vii; *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 825 (10th Cir. 2005), cert. denied, 546 U.S. 1170 (2006).

[9]Kerwin Decl. ¶ 9.

In December 2004, Flying J filed suit against TA Operating Corp. ("TA") alleging that TA, who is also a defendant in this case, had intentionally sabotaged Flying J's Wi-Fi system (the "Wi-Fi case").  Flying J was represented by Gibson Dunn and the law firm of Ray Quinney & Nebeker ("Ray Quinney") in the Wi-Fi litigation.[10]  During the course of discovery in the Wi-Fi case, TA produced an e-mail prepared by Michael Hinderliter, TA's senior Vice President of Sales (the "Hinderliter e-mail").[11]  In Flying J's view, the Hinderliter e-mail discussed a boycott by Petro, TA, and Pilot[12] of the trucker fuel card issued by Flying J's subsidiary, TCH.[13]

After discovery of the Hinderliter e-mail, Flying J, through its counsel Gibson Dunn, sought leave to amend the complaint in the Wi-Fi case to include allegations of an antitrust conspiracy.  The court denied the motion, however, finding that the antitrust claims were a "distinct cause of action" from the claims in the Wi-Fi case.[14]  The court further observed that Flying J could elect to assert the antitrust claims in a separate lawsuit.[15]  That same day, February 27, 2006, Flying J filed this lawsuit against TA and Pilot, alleging that Petro, Pilot, and TA, had engaged in a conspiracy to boycott the TCH card.[16]  Petro was not named as a defendant.  Gibson

---

[10]Opposition at xii.  The Wi-Fi case is *Flying J Inc. v. TA Operating Corp.*, No. 1:04-CV-177 BSJ.

[11]Kerwin Decl. ¶ 13.  The Hinderliter e-mail is attached as exhibit 5 to the Complaint in this case.

[12]Pilot Travel Centers LLC and Pilot Corp. (collectively "Pilot") are also defendants in this case.

[13]See the Hinder liter e-mail; Complaint ¶¶ 48-56.

[14]See transcript of February 27, 2006 hearing at 38, attached as Exhibit 1 to O'Brien Decl., docket no. 137, filed July 27, 2007.

[15]*Id.*

[16]Complaint ¶¶ 48-56.

Dunn did not disclose to Petro that it was filing the complaint, prior to doing so, or seek a waiver of the conflict of interest.[17]

Flying J is represented in this litigation by Gibson Dunn and Ray Quinney, with Gibson Dunn serving as lead counsel.[18]  On the same day the complaint was filed, Jonathan Dibble of Ray Quinney sent a letter to John Howell, Petro's in-house counsel.[19]  A copy of the complaint in this case was attached to the letter.

Mr. Howell states that shortly after the complaint was filed, Mr. Dibble contacted him about this case to arrange an interview with a senior officer at Petro.  Mr. Howell states that although the stated purpose of the interview was to resolve issues related to this litigation without involving Petro as a defendant, it subsequently became apparent that a possible purpose of the interview might be to discover information that could be used to accuse Petro of illegal acts.[20]  Mr. Howell states that at the time, Gibson Dunn did not disclose that it was involved in this case. He states that he felt "professionally deceived" that Gibson Dunn did not tell him that it was simultaneously accusing Petro of illegal acts and acting as Petro's primary outside counsel.[21]  Mr.

---

[17]Howell Decl. ¶ 6; O'Brien Decl. ¶ 4.

[18]Opposition at xviii.

[19]Dibble Decl. ¶ 5, docket no. 164, filed August 29, 2007; letter of February 27, 2006 from Jonathan Dibble to John Howell, attached as Exhibit A to the Dibble Decl.

[20]Howell Decl. ¶ 7.

[21]*Id.*

Howell states that Petro only learned that Gibson Dunn was Flying J's lead counsel in this case when he focused on the complaint after the interview conducted by Ray Quinney.[22]

Mr. Howell states that after Petro learned that Gibson Dunn was lead counsel for Flying J in this case, Gibson Dunn made several attempts to obtain a waiver from Petro so that Gibson Dunn could continue to represent both Flying J and Petro.[23]  Despite Gibson Dunn's efforts, Petro refused to consent to a waiver of the conflict because Flying J would not agree not to sue Petro.[24] In fact, the waiver letter submitted for Mr. Howell's signature made clear that a lawsuit by Flying J against Petro was indeed a possibility:

> By signing this letter, Petro agrees and understands that, because of the nature of the claims in the Flying J Antitrust Litigation, some facts, arguments, and positions developed by GD&C with respect to the defendants in the Flying J Antitrust Litigation could be applied by Flying J or third parties against Petro and/or its employees in a separate litigation in which GD&C will not be involved.[25]

After Petro refused to sign the conflict waiver, Gibson Dunn terminated its representation of Petro by letter, dated February 9, 2007, .[26]

On May 30, 2007, Petro was acquired by TA.  Petro states that after the acquisition, Petro and TA put together facts that had previously been known to one or the other, but not to both of

---

[22]*Id.* ¶ 8.

[23]*Id. ¶ 9*.

[24]*Id.* ¶ 10.

[25]Letter at 2, dated August 10, 2006, from Gregory Kerwin to John Howell and Barre Burgon, attached as Exhibit C to Howell Decl.

[26]Howell Decl. ¶ 11; letter, dated February 9, 2007, from Dean Kitchens of Gibson Dunn to John Howell, attached as Exhibit D to Howell Decl.

them, revealing the extent of what they alleged to be Gibson Dunn's unethical conduct in this

case.  Specifically, TA and Petro put together facts including that market definition is an

important issue in this case, that Petro had previously provided Gibson Dunn facts about Petro's

business that could be used to legally define the market in this case, and that Gibson Dunn had

previously given Petro advice about the legal definition of the market in which Petro does

business under applicable antitrust law that may be inconsistent with Gibson Dunn's and Flying

J's position in this case.[27]

 Petro states that after discovering the extent of Gibson Dunn's conflicts and non-

disclosures, Thomas O'Brien, Petro's President, wrote a letter to Gibson Dunn's management

committee on June 21, 2007, requesting that Gibson Dunn withdraw from this litigation.[28]  Mr.

O'Brien stated that although the fact that TA now owned Petro was an aggravating factor, that

was not the basis for his objection to Gibson Dunn's continuing to pursue this case.  Rather, the

problem "arose because your Denver office began a new litigation directly adverse to Petro,

without disclosure, at a time when that same office was regularly representing Petro and because

your Denver office continued in this dual representation for a full year without obtaining a

waiver."[29]

 In a letter dated June 29, 2007, Dean Kitchens of Gibson Dunn responded that as general

counsel for Gibson Dunn, he had undertaken a "thorough review of these matters" and was

---

[27]Howell Decl. ¶ 12; O'Brien Decl. ¶ 7.

[28]O'Brien Decl. ¶ 9; letter dated June 21, 2007, from Thomas O'Brien to the Gibson Dunn Management Committee ("O'Brien letter"), attached as Exhibit 2 to O'Brien Decl.

[29]O'Brien letter at 3.

satisfied that his firm had "acted properly in all respects."[30]   The parties exchanged additional

correspondence, but Gibson Dunn persisted in its refusal to withdraw from this litigation.[31]   On

July 27, 2007, Petro filed the motion to disqualify Gibson Dunn as counsel for Plaintiffs in this

lawsuit.[32]

## DISCUSSION

### Expert Testimony of Professor Morgan

In support of its reply memorandum, Petro submitted the Declaration of Thomas D.

Morgan,[33] Professor of Law at Georgetown University Law School, containing expert testimony

on the issue of disqualification.  In response, Gibson Dunn filed a motion to strike Professor

Morgan's declaration or, in the alternative, to be allowed to file a sur-reply with its own expert

testimony.[34]   The court concludes that expert opinion is not necessary to its decision and hereby

strikes Professor Morgan's declaration.  The court will not consider Professor Morgan's

declaration, or argument based upon it, in ruling on the motion to disqualify.

---

[30]Letter of June 29, 2007 from Dean Kitchens to Thomas O'Brien at 1, attached as Exhibit 3 to O'Brien Decl.

[31]See letters attached as Exhibits 4-8 to O'Brien Decl.

[32]Docket no. 134.

[33]Docket no. 193, filed October 25, 2007.

[34]Docket no. 209, filed November 8, 2007.

**Legal Standard**

"It is well-established that ordinarily 'the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge' and is thus a matter of judicial discretion."[35] "Motions to disqualify are governed by two sources of authority."[36] First, lawyers are bound by the local rules of the court in which they appear. Federal courts generally adopt the rules of professional conduct of the state in which they are located. Second, because motions to disqualify "are substantive motions affecting the rights of the parties, they are decided applying standards developed under federal law."[37] Therefore, such motions "are governed by the ethical rules announced by the national profession and considered 'in light of the public interest and the litigants' rights.'"[38]

The local rules of this court specifically provide that "attorneys practicing before this court . . . are governed by and must comply . . . with the Utah Rules of Professional Conduct, . . . as interpreted by this court."[39] "Utah has adopted, with some variations, the American Bar Association Model Rules of Professional Conduct."[40] The Tenth Circuit has stated that the ABA

---

[35]*Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994)(quoting *Redd v. Shell Oil Co.*, 518 F.2d 311, 314 (10th Cir. 1975)).

[36]*Cole*, 43 F.3d at 1383.

[37]*Id.*

[38]*Id.* (quoting *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)).

[39]DUCivR 83-1.1(h).

[40]*SLC Ltd. V v. Bradford Group West, Inc.*, 999 F.2d 464, 466 (10th Cir. 1993).

Model Rules of Professional Conduct "reflect the national standard to be used in ruling on disqualification motions."[41]

**Rule 1.7**

Petro contends that Gibson Dunn should be disqualified under Utah Rule of Professional Conduct 1.7 which governs conflicts of interest involving current clients.  The Rule prohibits a lawyer from representing a client who is directly adverse to another client without obtaining the written consent of both clients.[42]  The pertinent part of the rule provides:  "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:  (a)(1)  The representation of one client will be directly adverse to another client."[43]  The rule further provides, however, that "[n]otwithstanding the existence of a concurrent conflict of interest . . ., a lawyer may represent a client if . . . each affected client gives informed consent, confirmed in writing."[44]

**"Hot Potato" Doctrine**

Gibson Dunn argues that because it terminated its representation of Petro before the motion to disqualify was filed, the motion should be analyzed under the less stringent standards of Rule 1.9 which governs conflicts involving former clients.  Petro, on the other hand, contends

---

[41]*Cole*, 43 F.3d at 1383.

[42]Gibson Dunn asserts that it obtained a conflict waiver from Petro in 1999, when it first undertook representation of Petro (opposition at 30), an assertion disputed by Petro.  The court concludes that even if such a waiver was signed in 1999, it would not be effective to waive the current conflict arising many years later.

[43]Utah R. Prof'l Conduct 1.7(a).

[44]Utah R. Prof'l Conduct 1.7(b)(4).

that Gibson Dunn cannot cure the conflict by dropping Petro like a "hot potato" in order to

continue its representation of Flying J.

Generally, a lawyer may not drop one client so that he may continue to represent a more

favored one.

> The weight of authority holds, . . . that once the lawyers find themselves
> representing clients with adverse interests, they generally may not drop one client
> in order to represent the other, preferred client.  In other words, a lawyer or firm
> may not drop a current client like a "hot potato" in order to turn the client into a
> former client as a means of curing the simultaneous representation of adverse
> interests.[45]

As one commentator has explained, courts have agreed that, where a lawyer has terminated

representation of a client for the purpose of keeping a more important client happy, counsel will

be treated as if he is still the client's present attorney for purposes of determining whether

disqualification is warranted.[46]

**"Thrust upon" Conflict**

In support of its position, Gibson Dunn asserts that the conflict at issue falls within a

narrow exception to the "hot potato" rule known as the "thrust upon" doctrine.  The "hot potato"

rule is based on the notion that a lawyer should not be allowed to profit from a conflict of his

---

[45]*ABA/BNA Lawyers' Manual on Professional Conduct* 51:117-18 (Dec. 19, 2001)(citing *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 453 (S.D.N.Y. 2000); *Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n*, 909 F. Supp. 287, 293 (E.D. Pa. 1995); Restatement (Third) of the Law Governing Lawyers § 132 cmt. c (2000).  See also *Picker Int'l v. Varian Assoc.*, 670 F. Supp. 1363, 1365 (N.D. Ohio 1987)("A firm may not drop a client like a hot potato, especially if it is in order to keep happy a far more lucrative client."), *superseded by rule on other grounds as recognized by*, *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863 (S.D. Ohio 2002).

[46]Richard E. Flamm, *Lawyer Disqualification:  Conflicts of Interest and Other Bases* 270-72 (2003)(footnotes omitted).

own making.  When a conflict arises through no fault of the lawyer, this rational does not apply.

Thus, some courts have carved out an exception to the hot potato doctrine.[47]

> These courts have generally held that, when a conflict arises which the challenged law firm played no role in creating, counsel may avoid being disqualified from representing both of its clients by moving swiftly to sever its ties with one of them, in such a way as to minimize prejudice to the other."[48]

Comment 5 to Utah Rule 1.7 recognizes the doctrine:

> Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter.  Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict.[49]

Gibson Dunn contends that the conflict at issue was "thrust upon" it when it discovered the Hinderliter e-mail, and that it took the proper steps to terminate its representation of Petro under the rules governing "thrust upon" conflicts.[50]  However, in most of the cases applying the "thrust upon" doctrine, the conflict was created, not by any conduct of the law firm, but by events such as corporate mergers and acquisitions.[51]  In this case, although Petro was acquired by

---

[47]*Id.* at 274; see also *Lawyers' Manual on Professional Conduct*, *supra*, at 51:118; *Restatement of the Law Governing Lawyers* § 132 cmt. j.

[48]Flamm, *supra*, at 275 (footnotes omitted).

[49]Utah R. Prof'l Conduct 1.7 cmt. 5.

[50]Opposition at 16-28.

[51]*See, e.g.,Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121 (N.D. Ohio 1990)(conflict created when defendant in lawsuit acquired a client of the law firm who was representing the plaintiff).

TA, the acquisition did not create the conflict.[52]  Rather, the representation of adverse interests occurred when Gibson Dunn investigated, drafted, and filed the complaint in this case alleging wrongdoing by Petro, who at the time was its current client.

The parties have argued extensively in their briefing about whether this case is a continuation of Gibson Dunn's prior representation of Flying J, thus bringing it within the scope of the "thrust upon" doctrine, or whether this case is a new matter, making the doctrine inapplicable.  In particular, Petro relies upon Judge Jenkins' denial of Flying J's motion to amend its complaint in the Wi-Fi case to include the allegations in this case as proof that this case constitutes a distinct representation from Gibson Dunn's prior representation of Flying J.  The magistrate judge concludes that because the issue before Judge Jenkins was entirely different than the issue presented here, his decision denying amendment is not determinative of the question whether this case is a continuation of Gibson Dunn's prior representation such that the "thrust upon" doctrine should apply to this case.

In any event, the magistrate judge believes that the "thrust upon" doctrine is not applicable.  Although the discovery of the Hinderliter e-mail may have given rise to an unforeseen conflict, Gibson Dunn was aware of the conflict at the time it drafted and filed the complaint which contains serious allegations against its then current client, Petro.  Further, Gibson Dunn acted without disclosing the conflict to Petro or attempting to obtain a waiver.  In

---

[52]As Petro observes, Gibson Dunn seems to take the position throughout its memorandum that because Petro has been acquired by TA, Petro no longer exists as a separate entity; and that, therefore, Petro's motion for disqualification is somehow tainted.  (Reply at 12; see Opposition at i-ii, xv, 1, 2, 27, 30, 40).  The court believes that the acquisition of Petro by TA does not affect the merits of its motion.  Further, Petro asserts that it continues to exist; both Petro and TA are subsidiaries of a common parent company.  (Reply at 13 (citing *Tekni-Plex, Inc. v. Meyner and Landis*, 674 N.E. 2d 663, 669 (N.Y. 1996) for the proposition that a law firm's attorney-client relationship continues after a client is acquired by another entity)).

fact, rather than acting immediately to obtain consent, or in the absence of consent to withdraw, Gibson Dunn continued representing Petro for a full year after filing the complaint.[53]

Gibson Dunn places a great deal of reliance on opinions from the Bar of the City of New York and the District of Columbia Bar explaining the "thrust upon" doctrine.[54] The opinion from the Bar of the City of New York emphasizes that for the "thrust upon" doctrine to apply, "the conflict must truly be no fault of the lawyer."[55] The court finds that Gibson Dunn has not met this requirement since it did not act immediately to resolve the conflict. Instead, it pursued this litigation in the face of a clear conflict of interest without disclosing the conflict, seeking consent from Petro, or withdrawing its representation. Thus, this is not a situation that arose through no fault of Gibson Dunn.

The District of Columbia Bar opinion is likewise unhelpful because it interprets District of Columbia Rule 1.7(d) which allows a lawyer to continue a representation even in the absence of client consent under certain some circumstances. Utah Rule 1.7 does not contain this provision, and the court finds that the D.C. Bar opinion is therefore inapplicable.[56]

It is undisputed that Gibson Dunn was representing both Petro and Flying J at the time it drafted and filed the complaint in this case containing the allegations adverse to Petro. Thus, the

---

[53]See *Carlyle Towers Condo. Ass'n v. Crossland Sav.*, 944 F. Supp. 341, 347 (D.N.J. 1996)(law firm withdrew as counsel as soon as conflict became evident); *Fla. Ins. Guar. Ass'n v. Carey Canada, Inc.*, 749 F. Supp. 255, 261 (S.D. Fla. 1990)(former representation rule should apply when counsel *immediately* withdraws from representation after discovering the conflict).

[54]Attached as Exhibit A to Palmer Decl., docket no. 165, filed August 29, 2007.

[55]*Ass'n of the Bar of the City of New York Comm. on Prof'l & Judicial Ethics, Formal Opinion 2005-05*, at 6.

[56]See *ABA/BNA Lawyers' Manual on Professional Conduct* 51:102-03 (including District of Columbia Rule 1.7 in list of rules that "differ substantially from Model Rule 1.7").

court considers this "a case of simultaneous, not prior, representation",[57] to be analyzed under Rule 1.7, rather than Rule 1.9.  The court further concludes that Gibson Dunn's conduct violated Rule 1.7"'s prohibition against representing a client if the representation involves a concurrent conflict of interest.

**Remedy**

Having determined that Gibson Dunn's conduct violated the ethical rules, the court must now determine whether disqualification is the appropriate remedy, a determination left to the discretion of the trial court.[58]  The court is mindful that a party in a civil case has an interest in being able to retain counsel of its choice.[59]  Further, disqualification "is a 'drastic' measure and a court should hesitate to impose it except when 'necessary.'"[60]  Further, a motion to disqualify should be viewed with "extreme caution, . . . recognizing the possible unfair advantage that may result."[61]

Petro asserts that because the duty of loyalty is so important, many courts have applied a per se rule of disqualification in cases of concurrent adverse representation.[62]  In prior cases, however, this court has concluded that the fact that an attorney has violated the ethical rules does

---

[57]*See* *Bodily v. Intermountain Health Care Corp.*, 649 F. Supp. 468, 473 n.7 (D. Utah 1986)(noting that the operative facts occurred while the law firm was representing both clients simultaneously).

[58]*See* *Cole*, 43 F.3d at 1381; *SLC Ltd.*, 999 F.2d at 466; *Redd*, 518 F.2d at 314.

[59]*Proctor & Gamble Co. v. Haugen*, 183 F.R.D. 571, 574 (D. Utah 1998).

[60]*Haugen*, 183 F.R.D. at 574 (quoting *Bullock v. Carver*, 910 F. Supp. 551, 559 (D. Utah 1995), *aff'd*, 297 F.3d 1036 (10th Cir. 2002)).

[61]*Parkinson v. Phonex Corp.*, 857 F. Supp. 1474, 1480 (D. Utah 1994).

[62]Memorandum in Support of Petro's Motion to Disqualify ("Supporting Mem.") at 15, docket no. 135, filed July 27, 2007 (citing cases).

not automatically result in disqualification.[63]  Rather, the court has applied a "functional analysis"

to determine whether disqualification is appropriate.[64]

In deciding a disqualification motion, the court must carefully consider the facts of the

particular case,[65] the nature of the violation, and its impact on trial proceedings.[66]  Factors to be

considered include (1) the egregiousness of the violation, (2) the presence or absence of prejudice

to the other side, (3) whether and to what extent there has been a diminution of effectiveness of

counsel, (4) hardship to the other side, and (5) the stage of trial proceedings.[67]  The essential issue

to be determined "is whether the alleged misconduct taints the lawsuit."[68]

In two cases considering a conflict of interest during concurrent adverse representation,

this court denied motions for disqualification of conflicted counsel.  In *Parkinson v. Phonex

Corp.*,[69] the law firm representing the plaintiffs discovered that one of its members had

---

[63]*See Parkinson*, 857 F. Supp. at 1476, 1480, 1481, 1484.

[64]*Haugen*, 183 F.R.D. at 574 (applying "functional analysis" to motion for disqualification based on violation of counsel's work product protection); *Bullock v. Carver*, 910 F. Supp. at 559-60 (although not specifically considering Rule 1.7, the court stated that automatic, inflexible disqualification was not appropriate and applied a "functional approach" in determining whether counsel should be disqualified for conflict of interest); *see also SLC Ltd.*, 999 F.2d at 468 (although not considering a violation of Rule 1.7, the court noted that "the Model Rules shift away from a per se disqualification rule, to 'support a functional analysis of such conflicts of interest.'" (quoting *Smith v. Whatcott*, 757 F.2d 1098, 1101 n.2 (10th Cir. 1985), *superseded by rule on other grounds as recognized by SLC Ltd. V v. Bradford Group West, Inc.*, 999 F.2d 464, 468 (10th Cir. 1993)).

[65]*Parkinson*, 857 F. Supp. at 1476; *Bodily*, 649 F. Supp. at 478; *SLC Ltd. V*, 999 F.2d at 468; *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377 (1981)(stating that decision whether to disqualify counsel "ordinarily turns on the peculiar factual situation of the case then at hand.").

[66]*Bodily*, 649 F. Supp. at 473.

[67]*Parkinson*, 857 F. Supp. at 1476; *Bodily*, 649 F. Supp. at 478.

[68]*Parkinson*, 857 F. Supp. at 1476; *Bodily*, 649 F. Supp. at 478.

[69]857 F. Supp. 1474.

represented one of the defendants, Simonson, for about a month in an estate-planning matter.

When the firm discovered the conflict, it immediately terminated the estate-planning

representation and also dismissed Simonson as a defendant in the lawsuit.  Applying the factors

set forth above, the court found that disqualification of counsel was not appropriate.

In *Bodily v. Intermountain Health Care Corp.*,[70] the Howard law firm represented Bodily

in a personal injury case against Intermountain Health Care ("IHC").  During the course of the

representation, Johnson, an attorney with the Howard firm, agreed to act as local counsel for a

California firm which was representing IHC in a different case (*Wilson*).  Johnson did not

perform any substantive work on the *Wilson* case.  Rather, his involvement included procedural

duties such as moving for admission of members of the California firm to practice in the *Wilson*

matter, and reviewing documents prepared by the California firm to make sure that they

conformed with the local rules of practice.  His fee for legal services and costs totaled $195.82.

Although Johnson was aware of the conflict of interest, he apparently relied on the California

firm's representation that IHC had consented to the dual representation.  No written consent from

IHC was obtained, however, and no consent was obtained from Bodily.  When IHC's local

counsel discovered the dual representation, they immediately contacted Johnson and terminated

his employment.  Johnson then withdrew as counsel in the *Wilson* case.  IHC subsequently filed a

motion to disqualify the Howard firm from representing Bodily.  The district court found that the

Howard firm's simultaneous representation violated the applicable ethical rule,[71] but denied the

---

[70] 649 F. Supp. 468.

[71] *Bodily* was decided before the adoption of the Utah Rules of Professional Conduct.

motion for disqualification.  In making its determination, the court noted that the case did not

present a situation where one client had gained an unfair advantage over another because of an

attorney's wrongdoing.  The small amount of time spent and the very modest fee demonstrated

that counsel had no incentive for reward.[72]  The court further found that the continued

representation would not prejudice IHC.  Moreover, disqualification would substantially delay

the proceedings, and would work an undue hardship on Bodily.[73]

In this case, the court finds that counsel's conduct was more egregious than in the

*Parkinson* and *Bodily* cases.  In those cases, the simultaneous representation was of short

duration.  In *Parkinson*, the conflicted attorney was unaware of the conflict which apparently

resulted from his assistant's failure to circulate a conflicts check.  When the firm discovered that

it had run afoul of the ethical rule, it took immediate steps to correct the situation.  In *Bodily*,

Johnson's representation was entirely procedural and involved little time or legal fees.  In

contrast, Gibson Dunn's conduct in drafting and filing the complaint was clearly adverse to its

client Petro.  Further, it continued its dual representation for at least a year after it filed the

complaint.  Finally, Gibson Dunn received large fees from both clients.

Next, the court considers prejudice to Petro as a result of the conflicted representation.

Petro states that "Gibson Dunn's antitrust work included analysis of the legal definition of the

market in [which] Petro operates and the percentage shares represented by Petro and certain

---

[72]*Bodily*, 649 F. Supp. at 478.

[73]*Bodily*, 649 F. Supp. at 478-79.

competitors in that market."[74]  Petro asserts that market definition is an important issue in this

case.  Petro states that it previously provided Gibson Dunn with facts about its business "which

may be used to legally define the relevant market in this case and that Gibson Dunn previously

[gave] Petro advice about market definition that may be inconsistent with Gibson Dunn's and

Flying J's position in this case."[75]

Gibson Dunn responds that its representation of Petro involved only transactional/

securities work.[76]  It states that "Gibson Dunn did not provide antitrust advice to Petro except in

connection with a few isolated questions on particular transactions."[77]  In a letter to Attorney

Howell of Petro, Dean Kitchens of Gibson Dunn stated:

> I have consulted with Richard and Steve as to the reference in your letter
> that you have sought counsel from Gibson Dunn as to confidential "business
> plans, strategies and antitrust practices" and they have informed me that, except in
> connection with specific transactions having nothing to do with matters at issue in
> the present lawsuit, they do not recall being consulted on such matters.  If you
> have any information to the contrary, please let me know.  In any event, we have
> an ethical screen in place that would prevent the sharing of any such information
> if it existed.[78]

Gibson Dunn states that Mr. Howell did not respond to Mr. Kitchen's letter with any further

information concerning Gibson Dunn's representation.[79]

---

[74]Supporting Mem. at 3 (citing Howell Decl. ¶ 2).

[75]Supporting Mem. at 5, 17 (citing Howell Decl. ¶ 12).

[76]Opposition at ix.

[77]*Id.* at x.

[78]*Id.* at x; letter, dated February 9, 2007, from Dean Kitchens to John Howell, attached as Ex. D to Howell Decl.

[79]Opposition at x.

Gibson Dunn asserts that "[Petro] has no factual basis to contend that Gibson Dunn has used, or will use, information relating to the past representation to the disadvantage of [Petro], or will reveal information relating to the past representation.[80]  It states that its lawyers have not been, and will not be, involved in obtaining discovery from Petro, all aspects of which will be handled by Ray Quinney.  In addition, Gibson Dunn will continue to "fence off" any information it has concerning Petro.[81]

The court notes that Petro's description of possible information about its business obtained by Gibson Dunn is vague, as is its argument concerning its possible use in this litigation.  As Gibson Dunn points out, Petro's descriptions of the truck-stop market in SEC filings are public disclosures.[82]  The court is not convinced that Gibson Dunn obtained information from Petro that could be used to Petro's disadvantage in this litigation in which Petro is not a party.  Further, the steps taken by Gibson Dunn to isolate any information that it may have obtained, and to have Ray Quinney conduct discovery from Petro, should minimize any prejudice to Petro.

The next *Parkinson/Bodily* factor is diminution of the effectiveness of counsel.  The court's confidence in Gibson Dunn's ability to vigorously and fairly represent its clients in this case has not been so undermined as to warrant disqualification.[83]  While this motion has been a significant distraction, that will cease with the entry of this order.

---

[80]*Id.* at 33.

[81]*Id.* at 40.

[82]*Id.* at 39.

[83]*See Bodily*, 649 F. Supp. at 478.

Next, the court believes that the hardship that disqualification would inflict on Flying J would be significant.  Gibson Dunn has represented Flying J for many years in other litigation that involves some of the same facts as this case.  As a result, Gibson Dunn is highly familiar with Flying J's business and legal matters.  Petro argues that Flying J may not be significantly prejudiced by disqualification because Ray Quinney has been continuously involved in the litigation.  Petro suggests that if Gibson Dunn is disqualified and  Flying J elects to hire new co-counsel, it might be appropriate to require Gibson Dunn to pay the costs necessary to bring the new firm up to speed.[84]  Although there is some merit to Petro's arguments, the court believes that disqualification would work a great hardship on Flying J.

Finally, the court considers the stage of trial proceedings.  Although the trial date is not imminent, this case was filed two years ago.  Discovery is well under way, and numerous motions have been filed and decided.  The court believes that disqualification would significantly delay the proceedings in this complex case.[85]  The court therefore concludes that the stage of proceedings weighs against disqualification.

In a related argument, Gibson Dunn contends that even assuming that a proper basis for disqualification exists, Petro has waived the argument by failing to file a timely motion.[86]  In response, Petro states that this argument seems particularly inappropriate since Gibson Dunn failed to disclose the conflict to Petro either before or after it commenced the litigation.  Petro

---

[84]Reply Memorandum in Support of Petro's Motion to Disqualify ("Reply") at 14, docket no. 190, filed October 25, 2007.

[85]See *Bodily*, 649 F. Supp. at 478.

[86]Opposition at 41-45.

states that it "was not until TA's parent company acquired Petro that Petro learned all of the true

facts of Gibson Dunn's conflict; for example, that market definition, about which Petro had

received legal advice from Gibson Dunn, was an important issue in the present litigation."[87]

Petro states that within a few day after learning these true facts, it wrote Gibson Dunn requesting

that Gibson Dunn withdraw.[88]  Petro argues that since it was misled by Gibson Dunn, Gibson

Dunn should not be allowed to complain about Petro's asserting its rights after the true

circumstances were revealed.[89]

It is well-settled that "disqualification motions must be diligently pursued to avoid waiver

and may not be used as strategic litigation tactics."[90]  This case was filed February 27, 2006.

Petro's motion to disqualify was not filed until July 27, 2007, seventeen months later.

It is not disputed that Ray Quinney sent a copy of the complaint in this case to counsel for Petro

on February 27, 2006, the day it was filed.  It was clear from the face of the complaint that

Gibson Dunn was representing Flying J in this case.  Although counsel for Petro stated that he

did not focus on the complaint until after the interview conducted by Ray Quinney,[91] the court

believes that Petro is not entirely without fault for not discovering the conflict and filing its

motion to disqualify earlier in the litigation.  Thus, the court concludes that Petro's delay in filing

the motion weighs against disqualification.

---

[87]Reply at 13.

[88]*Id.*

[89]*Id.*

[90]*Smith*, 757 F.2d at 1100; *Redd*, 518 F.2d at 315.

[91]Howell Decl. ¶ 8.

After considering the *Parkinson/Bodily* factors, the court concludes that Gibson Dunn's continued representation of Plaintiffs in this case will result in less harm to the case than would result from Gibson Dunn's involuntary disqualification.  Accordingly the court concludes that the case will not be sufficiently tainted as to warrant a disqualification order.

### ORDER

For the foregoing reasons, Petro's motion to disqualify is **DENIED**,[92] and Plaintiffs' motion to strike the declaration of Professor Morgan is **GRANTED**.[93]  The court hereby **STRIKES** Professor Morgan's declaration.[94]

Dated this 10th day of March, 2008.

BY THE COURT:

David Nuffer
United States Magistrate Judge

---

[92]Docket no. 134, filed July 27, 2007.

[93]Docket no. 209, filed November 8, 2007.

[94]Docket no. 193, filed October 25, 2007.