IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| FLYING J INC.; TCH LLC; TRANSPORTATION ALLIANCE BANK, INC.; and TON SERVICES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> TA OPERATING CORPORATION, now known as TA OPERATING LLC d/b/a TRAVELCENTERS OF AMERICA; TRAVELCENTERS OF AMERICA, LLC; PILOT TRAVEL CENTERS LLC; PILOT CORPORATION; COMDATA NETWORK, INC. d/b/a COMDATA CORPORATION, <br><br> Defendants. | ORDER <br><br> AND <br><br> MEMORANDUM DECISION <br><br> Case No. 1:06-CV-30-TC |

   In this antitrust case, the Plaintiffs (Flying J Inc. et al.)[1] recently added Defendant

Comdata Network, Inc. to their First Amended Complaint.[2]  Comdata now moves for dismissal

under Rule 12(b)(6) of all of Plaintiffs' claims, or, in the alternative, an order striking all

allegations (and exhibits) relating to pre-settlement conduct (i.e., acts occurring before May 2001

_____

   [1]The "Flying J Plaintiffs" include Flying J, Inc., TCH LLC, Transportation Alliance Bank, Inc., and TON Services, Inc.

   [2]Earlier in the case, the Flying J Plaintiffs agreed to dismiss all claims against Defendants TA Operating Corporation and TravelCenters of America LLC.  The order granting their joint motion for dismissal was entered on May 5, 2008 (see Dkt # 335).  Accordingly, the Defendants now consist of the Pilot Defendants (Pilot Travel Centers LLC and Pilot Corporation) and Comdata.

when Flying J and Comdata settled a separate antitrust action).[3]  The Pilot Defendants (Pilot

Travel Centers LLC and Pilot Corporation) have filed a motion to dismiss that simply joins in

Comdata's motion (similarly, Flying J's opposition to the Pilot Defendants' motion incorporates

by reference its memorandum opposing Comdata's motion).[4]  For the reasons set forth below, the

motions to dismiss or strike pre-settlement allegations are DENIED, with the exception that the

court dismisses Flying J's allegations under non-Utah state antitrust statutes.

## PROCEDURAL BACKGROUND

The First Amended Complaint (consisting of 148 pages of allegations and claims, 9

unsealed exhibits totaling approximately 120 pages, and a Confidential Appendix containing 43

exhibits) asserts seven claims for relief against Comdata:[5]

- First Claim for Relief: **Unlawful Group Boycott**, in violation of Sherman Act, 15 U.S.C. § 1

- Second Claim for Relief: **Conspiracy to Monopolize**, in violation of Sherman Act, 15 U.S.C. § 2

- Third Claim for Relief: **Violation of the Utah Antitrust Act** and the **"Antitrust Statutes of Any State Where Defendants Are Found To Have Caused Damages"**

- Fourth Claim for Relief: **Tortious Interference With Economic Relations and Prospective Economic Advantage**

---

[3]Comdata moves to strike under Federal Rule of Civil Procedure 12(f), which allows the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

[4]The Pilot Defendants did file a Reply, but it is, at least in part, improper because it relies on responses to interrogatories, which are not appropriate for consideration on a motion to dismiss.  The court disregards those materials outside the pleadings that are presented by the Pilot Defendants.

[5]The first five claims for relief also name the Pilot Defendants.

2

- Fifth Claim for Relief: **Civil Conspiracy**

- Sixth Claim for Relief: **Unlawful Monopolization**, in violation of Sherman Act, 15 U.S.C. § 2

- Seventh Claim for Relief: **Unlawful Attempt to Monopolize**, in violation of Sherman Act, 15 U.S.C. § 2

Comdata raises numerous bases for dismissal, with the most central being release language in a May 2001 "Settlement Agreement and Release" (Ex. C to Comdata's Mem. Supp. [hereinafter "Settlement Agreement"])[6] between Comdata, three of the four Plaintiffs in this case (Flying J, TCH LLC, and TON Services), and others involved in an earlier antitrust action (Flying J Inc. v. Comdata Network, Inc., No. 1:96-CV-66-DAK (D. Utah) [hereinafter Flying J I]).  On similar grounds, Comdata asserts a res judicata defense, contending that resolution of Flying J I bars all of Flying J's claims here.  Comdata also asserts specific defenses to individual claims.  For example, Comdata contends that (1) Plaintiffs' conspiracy allegations do not meet the standards set forth in Bell Atlantic v. Twombly, 127 S. Ct. 1955 (2007); (2) TON and Flying J lack "antitrust standing" as defined in Associated Gen. Contractors v. Cal. Council of Carpenters, 459 U.S. 519 (1983); (3) Flying J lacks "antitrust injury," as defined in Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990); and (4) choice of law principles preclude consideration of other states' antitrust acts and common law of torts.

---

[6]Because the First Amended Complaint refers to the Settlement Agreement (indeed both Comdata and Flying J attach it to their respective briefs), its contents may be considered part of the allegations the court considers when determining whether to grant the 12(b)(6) motion to dismiss.  See GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997) (holding that where a written contract is referred to in a complaint and is central to a breach of contract claim, but is not submitted for judicial review, an indisputably authentic copy of the contract may be considered on a motion to dismiss without converting motion to one for summary judgment).

<u>ANALYSIS</u>

First, this Order addresses the discrete issue of whether the court should consider Comdata's alternative request to strike allegations of pre-settlement conduct.  The Order then focuses on the merits of Comdata's defenses.

**1.      <u>COMDATA'S REQUEST TO STRIKE ALLEGATIONS OF PRE-SETTLEMENT CONDUCT</u>**

Comdata moves to strike allegations relating to pre-settlement conduct, citing Federal Rule of Civil Procedure 12(f), which allows the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Flying J contends that it is not relying on pre-settlement conduct to establish the antitrust liability of Comdata.  Instead, it says the material in the First Amended Complaint (FAC) provides context and also serves to present allegations against the Pilot Defendants, who were not party to the Settlement Agreement.

Striking the allegations of pre-settlement conduct would be an extreme measure.  Given the multiple purposes of the allegations, striking them here would not be proper.  Accordingly, that portion of Comdata's motion is DENIED.

Whether the court may consider them when determining whether Flying J has met its pleading obligations under Rule 8 and <u>Twombly</u> is another matter, which is discussed below.

**2.      <u>COMDATA'S MOTION TO DISMISS</u>**

      **a.      <u>The Fate of Flying J's Common Law and State Antitrust Statute Claims is Tied to Flying J's Federal Antitrust Claims</u>.**

Flying J alleges violations of the Utah Antitrust Act (and forty-five other state antitrust

4

acts),[7] Tortious Interference with Prospective Economic Relations, and Civil Conspiracy.  To a large extent, the fate of these causes of action is tied to the fate of the federal antitrust claims.

First, in the Utah Antitrust Act, the Utah Legislature provided that it "intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."  Utah Code Ann. § 76-10-926 ("Interpretation of Act").  And Flying J admits in its First Amended Complaint that the Utah Antitrust Act "is essentially identical to the Sherman Act."  (FAC ¶ 246.)  Furthermore, Flying J relies on its Sherman Act allegations to support its claim that the Defendants violated the Utah Antitrust Act.

Second, Flying J alleges, in its Tortious Interference Claim, that violation of the antitrust laws satisfies the tort's "improper means" element.

Third, Flying J contends that tortious interference or violation of the federal and state antitrust statutes satisfies the Civil Conspiracy's requirement that the party prove the existence of one or more unlawful, overt acts.

At this point, no separate analysis of the state law claims is necessary because they are so

---

[7]Flying J does not allege violations under each of the other forty-five state antitrust acts. It simply provides the citation to each statute.  Because the court should apply the law of the forum in which it sits (Utah), Flying J cannot maintain its alternative claims under other states' statutes.  Indeed, the Plaintiffs say they "alleged alternative claims under the applicable statute of each state that prohibits the unlawful conduct complained of in the FAC as protection in the event that this Court finds that the antitrust law of Utah is not the governing state law applicable to Defendants' conduct.  While Plaintiffs realize that applying the law of every one of these states to the claims in this case is not feasible (and Plaintiffs have no intention of attempting to proceed to trial under each of these state statutes), asserting alternative state law claims ensures that Plaintiffs will have recourse to state antitrust law if this Court were to find that the law of Utah does not apply."  (Pls.' Opp'n at 38.)  Accordingly, the court dismisses those causes of action that do not arise out of Utah or federal antitrust laws.

closely tied to the federal antitrust claims.

**b.      Effect of the Settlement Agreement and Comdata's Res Judicata Defense**

In 1996, Flying J brought suit against Comdata and others in the District Court of Utah, alleging antitrust and tort claims.  See Flying J Inc. v. Comdata Network, Inc., Case No. 1:96-CV-66-DAK (D. Utah).  In May 2001, the parties settled the action and obtained a stipulated judgment dismissing "all claims and counterclaims that have been or could have been asserted in this action."  (May 18, 2001 Order Granting Stipulated Motion for Dismissal of Claims (Dkt # 572 in 1:96-CV-66).)

As part of the Settlement Agreement and Release (effective May 21, 2001), Comdata agreed to pay $49 million to the plaintiffs and enter into two license agreements: the "Trendar License" and the "Comdata License."  (First Am. Compl. (FAC) ¶ 89.)  For a good description of the settlement and the licenses, see Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821 (10th Cir. 2005).

i.      Settlement Agreement and Release

The key language of the Settlement Agreement and Release is found in two places in the document: First, the Recitals provide:

E.      WHEREAS, without admitting any wrongdoing or liability and to avoid the expense of further litigation, the Parties to the Settlement Agreement desire to settle the Utah Lawsuit and the Ceridian Lawsuit in their entirety, including all claims, whether known or unknown, that have been asserted or could have been asserted therein against any person or entity . . . .

(Settlement Agreement Recitals ¶ E (incorporated by reference and made part of the agreement).)

Second, in the "Mutual Releases" section, the Settlement Agreement contains a very broadly worded release that reads in pertinent part as follows:

Subject to the provisions of this Settlement Agreement, FLYING J, TCH, CFJ, TON SERVICES, and TFJ, on behalf of themselves <u>and each of their affiliates</u>, hereby forever release, discharge and acquit COMDATA, TRENDAR, CERIDIAN, and ARBITRON, and each of them, together (as applicable) with each of their successors, assigns, parent corporations, subsidiaries, affiliates, partners, and joint venturers, and each of its or their respective present or former officers, directors, employees, agents, servants, shareholders, attorneys, experts, consultants, insurers, and representatives from <u>any and all rights, claims, obligations, liabilities, causes of action</u>, costs, damages, losses, expenses, compensation, and demands of every kind and nature, <u>whether known or unknown, that are based in whole **or in part** on any conduct occurring on or before the Effective Date [of May 21, 2001] including **but not limited to** conduct that **relates in any way**</u> to i. all claims that have been asserted or <u>could have been asserted</u> in any respect whatsoever in the Utah Lawsuit . . . . v. any and all claims <u>arising out of the relationship</u> between FLYING J, TCH, CFJ, TON SERVICES, and TFJ, on the one hand, and COMDATA, TRENDAR, CERIDIAN and ARBITRON, on the other hand <u>through the Effective Date</u>.

(Settlement Agreement & Release ¶ 5.1 (emphasis added).)  The court interprets the language "and each of their affiliates" to include Transportation Alliance Bank Inc. (TAB), even though TAB was not actually listed in the release.  (Indeed, no party argues that TAB is not subject to the release language.)  Accordingly, the fact that the Settlement Agreement only lists three of the four Plaintiffs is not material, and the language of the release should be read to apply to all of the Flying J Plaintiffs.

While the language of the release is very broad, the court agrees with Flying J that it cannot be read to release claims that did not arise as of May 21, 2001, and that are based on post-settlement conduct.  (<u>See</u> Settlement Agreement § 5.5 ("Release of Unknown Claims") (containing language agreeing that a "general release does not extend to claims which the [party] does not know or suspect to exist in his favor at the time of executing the release.").  Moreover, such a prospective release of antitrust claims would be void as against public policy.  <u>See, e.g.</u>, <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 637 n.19 (1985)

7

(stating in *dicta* that Court would "have little hesitation in condemning [any] agreement as against public policy" if it were interpreted to be "a prospective waiver of a party's right to pursue statutory remedies for antitrust violations"); <u>Redel's Inc. v. General Elec. Co.</u>, 498 F.2d 95, 99 (5th Cir. 1974) ("[T]he effect of [a prospective] release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well."); <u>Fox Midwest Theatres v. Means</u>, 221 F.2d 173, 180 (8th Cir. 1955) (holding that any contract absolving liability for future violation of antitrust statutes would be void as against public policy).

Flying J expressly states that it only alleges claims against Comdata that arose after May 21, 2001.  (<u>See</u> FAC ¶ 91.)  Such claims are fair game here.  Accordingly, Comdata may not prevail on its res judicata defense either, as discussed below.

The only question remaining is to what extent the court may consider the pre-settlement conduct allegations in analyzing the issues raised by the Motion to Dismiss.  But if the court finds that post-settlement conduct alleged in the First Amended Complaint is sufficient to survive the motion to dismiss, then the question need not be answered at this point.

ii.    <u>Comdata's Res Judicata Defense</u>

Plaintiffs have the better argument on this issue because they alleged anti-competitive acts that have occurred since May 2001.  The United States Supreme Court decision in <u>Lawlor v. National Screen Service Corporation</u>, 349 U.S. 322 (1955), is the leading case addressing res judicata in the context of antitrust cases.  In <u>Lawlor</u>, the defendants raised res judicata as a defense in a second antitrust suit brought by plaintiffs after an earlier suit between the same parties based on similar conduct was reduced to judgment in 1943.  The Court stated:

That both suits involved "essentially the same course of wrongful conduct" is not
decisive.  Such a course of conduct – for example, an abatable nuisance – may
frequently give rise to more than a single cause of action.  And so it is here.  The
conduct presently complained of was all subsequent to the 1943 judgment.  In
addition, there are new antitrust violations alleged here [that were] not present in
the former action.  While the 1943 judgment precludes recovery on claims arising
prior to its entry, it cannot be given the effect of extinguishing claims which did
not even then exist and which could not possible have been sued upon in the
previous case.  In the interim, moreover, there was a substantial change in the
scope of the defendants' alleged monopoly . . . .

Lawlor, 349 U.S. at 327-328.

The overall question is whether the Plaintiffs allege the same cause of action as was
alleged in the 1996 suit.  The answer is "no."  Clearly, Flying J has alleged anti-competitive
actions occurring since May 2001.  (See, e.g., FAC ¶¶ 103 (August 2001 extension of transaction
fee increase to all truck stops with 5,000 or fewer Comdata Card transactions per month); 105-
196 (revising "Merchant Transaction Pricing Structure"); 123-137 (attempt to punish Irving Oil
for switching to TCH card in 2003); 156 (bundling of SmartFuel software with fuel card
transaction fee discounts); 178-180 (post-2001 failures to enter fleet card market because of
significant barriers to entry); 186 (post-2001 significant barriers to entry into POS system
market); 189-194 (insisting on "reverse most favored nations" clauses in agreements with Pilot
and TA).  See also Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 421 F.2d 1313,
1318 (5th Cir. 1970) ("[S]ignificant actions (or non actions) occurring subsequent [to the earlier
judgment], either alone or in combination with acts which have been completed prior to [the
judgment date] may be the basis for new claims for damages traceable to such [actions].").

Also, the District Court for the Southern District of New York, facing a similar issue,
emphasized the "public policy considerations against giving a defendant immunity—in fact,

perpetual immunity—from liability, for such violations in the future . . . .  Here, as in <u>Lawlor</u>, while the course of conduct alleged may be a continuing one, the cause of action is not the same but different from that on which the judgments in the 1926 and 1949 actions were rendered." <u>United States v. Gen. Elec. Co.</u>, 358 F. Supp. 731, 740  (S.D.N.Y. 1973).  <u>See also</u> <u>Exhibitors Poster Exch.</u>, 421 F.2d at 1316 ("the use of [the res judicata doctrine] can cloak a party in perpetual immunity and thus possibly protect conduct lasting long past the prior judgment – conduct that the law may grow to abhor.").

Even though some of the alleged events occurred before May 21, 2001, such as Comdata's acquisition of monopoly power, that does not bar claims asserted by Flying J which are all based on situations and conduct that existed or occurred on or after May 21, 2001.

**c.      Flying J's Claims Under Sherman Antitrust Act Sections 1 & 2**

Section 1 of the Sherman Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, <u>in restraint of trade or commerce</u> among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1 (emphasis added). Flying J asserts an **"unlawful group boycott"** claim under this provision (<u>see</u> First Claim for Relief).[8]  To establish a claim under Section 1, the plaintiff must allege facts that show the defendants entered into a contract, combination or conspiracy that unreasonably restrains trade in the relevant market.  <u>TV Comm. Network, Inc. v. Turner Network Television, Inc.</u>, 964 F.2d 1022, 1027 (10th Cir. 1992).  "Under section one we determine the illegality of a . . . conspiracy

---

[8]The Clayton Act provides the private cause of action to sue under the Sherman Act and allows for monetary and injunctive relief.  <u>See</u> 15 U.S.C. § 12 (called the Clayton Act, it nevertheless defines "Antitrust Laws" to include the Sherman Act); § 15 (Clayton Act Section 4) (allowing for damages to person injured by antitrust violation); § 26 (Clayton Act Section 16) (allowing injunctive relief for private parties).

by examining whether: (1) it constitutes a per se violation of the statute; or (2) its purpose or effect is to create an unreasonable restraint of trade." Id. (internal alterations and quotation marks omitted).  In other words, the court's analysis under Section 1 must be either under the "per se" rule or the "rule of reason."  The distinction between the two modes of analysis and the circumstances when each applies is discussed below.

Section 2 of the Sherman Antitrust Act provides that a person "shall [not] monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ."  15 U.S.C. § 2.  Flying J alleges three causes of action under this provision:  **Conspiracy to Monopolize** (Second Claim for Relief), **Unlawful Monopolization** (Sixth Claim for Relief), and **Unlawful Attempt to Monopolize** (Seventh Claim for Relief).  For a quick summary of the elements of each cause of action, see TV Communications Network, 964 F.2d at 1025-26.  See also Verizon Commc'ns. Inc.  v. Law Office of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (addressing claim of "refusal to deal," the Court said, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.") (emphasis in original).

> i.    Brief Description of Each Party's Business and Function in the "Relevant Markets"

Before getting into the legal arguments, it is important to understand the business and function of each of the parties in the markets at issue.

> (a)    *The Parties*

**Flying J, Inc.** owns or operates nearly 170 truck stops in the United States.  It brings the

case "in both its capacity as operator and also on behalf of the owners of the Flying J truck stops that Flying J operates, including itself." (FAC ¶ 3.)

**TCH** (partially owned by Flying J) provides "a transportation clearinghouse and trucker fuel cards to truck fleets, trucking companies, their drivers, and independent owner/operators throughout the United States." (FAC ¶ 4.) It "offers a Trucker Fuel Card [specifically called a 'TCH Card'] to long-haul truck drivers and their truck fleets . . . and processes Trucker Fuel Cards for other card issuers." (Id.) The Plaintiffs define "Truck Fleets" as "[l]ong-haul 'over the road' truck drivers, including both drivers who work for trucking companies and independent owner/operators." (FAC ¶ 16.)[9] A "Trucker Fuel Card" (sometimes generically called a trucker fleet card) is a charge or credit card with additional features offered to Truck Fleets, including real-time data capture (information is immediately transmitted to the trucking company for monitoring driver's movements and activities, equipment, and costs), frequent and specialized reporting (e.g., for the purpose of tracking fuel taxes), purchase controls (allowing the trucking company to limit the amount and nature of the driver's purchases), and negotiated or discounted diesel fuel prices. (FAC ¶ 25.)

> By gathering such data from truck drivers at every fuel stop, Truck Fleets are able to monitor and control such things as the location of their trucks, when fuel is purchased, the amount of fuel that is purchased, the purchases of their drivers, and other information desired by Truck Fleets. Truck Fleets rely on gathering such electronic data to control their costs and to plan effective utilization of their assets and employees. Purchase controls are essential to Truck Fleets who must monitor and control the expenditures by their truck driver employees or leased owner/operator drivers who are purchasing fuel or other goods or services using the Truck Fleet's money at remote locations across the United States, in an industry with high driver turnover. Individual owner/operator truck drivers use

---

[9]"Truck Fleets" does not include local truck fleets and local truck drivers whose routes do not require an overnight stay away from home.

> Trucker Fuel Cards for such things as credit services, recordkeeping including tracking of information needed for state fuel taxes, and to obtain special fuel pricing that is sometimes available.

(FAC ¶ 24.)  The special features of Trucker Fuel Cards are only available if the cards are used at merchants that accept those cards at their fueling locations.

**Transportation Alliance Bank Inc. (TAB)** (a wholly owned subsidiary of Flying J) "provides financial products and services to Truck Fleets and others."  (Id. ¶ 5.)  It issues the TCH card, and extends credit to the trucking fleets.  It retains a portion of fees paid by the truck stops for processing the card purchases.

**TON Services Inc.** (a wholly owned subsidiary of Flying J) provides "transportation related services and products to Truck Fleets and others."  (FAC ¶ 6.)  For example, it provides Wi-Fi Services (e.g., wireless internet access, and mobile phone service) and calling cards to truckers.

**The Pilot Travel Centers LLC** and **Pilot Corporation** own and operate a large national chain of truck stops (travel plazas).

The now-dismissed **TA Defendants (TA Operating LLC and TravelCenters of America LLC)** are nationwide chains that own and operate travel centers to serve long-haul trucking fleets and their drivers, independent truck drivers and general motorists.  They compete with Flying J and Pilot.

**Comdata Network, Inc. d/b/a Comdata Corporation** issues trucker fleet cards like the TCH cards, and it provides hardware and software for point-of-sale (POS) transactions (the Trendar System).  Pilot and TA accept Comdata's fleet cards but refuse to accept the TCH card.

(b)       *The Markets*

For antitrust analysis, a market has a geographic component and a product component. Areeda & Hovenkamp, Antitrust Law ¶ 530 (3d ed. 2007).  The court's inquiry under Sections 1 and 2 of the Sherman Act usually begins by defining the "relevant market" (i.e., the "market relevant to the legal issue before the court").  SCFC ILC, Inc. v. VISA USA, Inc., 36 F.3d 958, 966 (10th Cir. 1994).  "'That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered.'"  Id. (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956)).

Flying J has identified three relevant product markets:  the "Trucker Fuel Card Market," the "Truck Stop POS Systems Market," and the "Major Truck Stops Market."  The relevant geographic market for all three product markets is the continental United States.

Flying J discusses all three markets, which are intertwined.  But the market where it alleges anti-competitive conduct (i.e., injury to competition) is the Trucker Fuel Card Market.

Plaintiffs allege antitrust violations in the Trucker Fuel Card Market,[10] which is a "two-sided" market (that is, the market serves two classes of customers: truck stops and truck fleets). The two-sided market has "network effects," meaning that "'demand for a fleet card rises with the number of truck stops that accept the card, which in turn depends on the number of fuel purchase automation systems that accept the card.'" Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 827 n.1 (10th Cir. 2005) (quoting FTC analysis of antitrust issues concerning

---

[10]Flying J notes that Comdata's request to dismiss any claim relating to the POS Systems Market is moot because the Plaintiffs do not allege harm to competition in that market.

Comdata).  The 2005 Tenth Circuit case just cited provides a very good explanation of the

relationship between the parties and the details of the business transactions at issue.  (See also

Paragraphs 32-40 of the First Amended Complaint (discussing product and geographic markets).)

        ii.      Summary of Flying J Plaintiffs' Dispute with Defendants

Under Section 1 of the Sherman Act, the Plaintiffs allege an unlawful horizontal and

vertical conspiracy that harms competition in the Trucker Fuel Card Market and the Major Truck

Stops Market and is perpetuated through concerted action by Comdata, Pilot, and TA.  Section 1

of the Sherman Act prohibits illegal restraints of trade.  There are several categories of restraints

of trade, including horizontal restraints (agreements among competitors such as TA and Pilot)

and vertical restraints (agreements between purchaser and supplier, such as TA and Pilot on the

one hand and Comdata on the other hand).  Specifically, Flying J alleges a group boycott, also

known as concerted refusals to deal, which "are agreements among rivals to refuse to deal either

with a competitor or with third parties who deal with the competitor."  Federal Antitrust Law

§ 9.2 (Matthew Bender & Co. 2007).

The group boycott, which has aspects of both horizontal and vertical restraints, is

explained in the First Amended Complaint as follows:

> Pilot and TA, two major truck stop chains, have worked in concert with each other
> and with Comdata as though they are all part of one vertically integrated entity
> instead of three separate firms.  This conspiracy, resulting from the cooperative
> and concerted action among Comdata, Pilot, and TA, is referred to in this
> Complaint as: "The Conspiracy."  Both on its own and in concert with Pilot and
> TA, Comdata has sought to limit TCH's card acceptance network and the
> attractiveness of the TCH Trucker Fuel Card to Truck Fleets, through its high
> transactions fees to the independent truck stops that accept the TCH card and
> through low transaction fees as a "*quid pro quo*" to the large truck stop chains,
> including Defendants Pilot and TA, that are willing to maintain their boycott of
> TCH Trucker Fuel Card transactions. [This is referred to as the two-tier pricing

> structure.]  Comdata has induced and rewarded Pilot and TA to maintain their
> boycott of the TCH Trucker Fuel Card, while suppressing fuel discount
> competition between Pilot and TA.  Comdata has worked closely with Pilot and
> TA, providing financial and other rewards to them while disadvantaging their
> truck stop competitors, all in exchange for their assistance in helping Comdata to
> maintain its dominant position in the Trucker Fuel Card Market.  That structure
> benefits Defendants Pilot and TA by lowering their costs while dramatically
> increasing the costs of their rivals that also are able to accept Comdata Cards as a
> method of payment, the independent truck stops.

(FAC ¶ 43.)  "The Conspiracy derives its market power from Comdata's monopoly power in the

Trucker Fuel Card Market and Truck Stop POS Systems Market, and the substantial combined

market share of Pilot and TA in the Major Truck Stops Market."  (Id. ¶ 46.)

Under Sherman Act § 2, the Plaintiffs challenge the unilateral anti-competitive conduct of

Comdata, alleged to have a monopoly in the Trucker Fuel Card Market and Truck Stop POS

Systems Market.

> Section 2 [of the Sherman Act] creates three offenses: monopolization, attempted
> monopolization, and conspiracy to monopolize. [Plaintiffs have alleged all three.]
> Monopolization is the acquisition or maintenance of monopoly power to
> inefficient collusive or exclusionary means, which may include, but are not
> limited to restraints that violate Section 1.  Thus, the offense requires a showing
> of monopoly power and inefficient acts used to acquire or maintain it.
> Monopolistic acts include mergers to monopoly and various exclusionary
> practices, like predatory pricing, refusals to deal, exclusive contracts, and so forth.
> Attempted monopolization is the doing of these kinds of monopolistic acts with
> the specific intent to monopolize in circumstances in which there is a dangerous
> probability of success.  Thus, while monopolization and attempted
> monopolization typically involve similar conduct, the attempt offense requires a
> showing of somewhat more egregious conduct, and something less than present
> monopoly power.

Id. (footnotes omitted).

### d.    Sufficiency of Conspiracy Allegations Under *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007).

Comdata challenges the sufficiency of conspiracy allegations supporting Flying J's First

and Second Claims for Relief—Unlawful Group Boycott and Conspiracy to Monopolize—which

are brought, respectively, under the Sherman Antitrust Act Sections 1 and 2.  Given the

"plausible" standard in Twombly, and taking the Plaintiffs' allegations as true, the allegations of

post-settlement conduct (and inferences to be drawn from them) are sufficient to establish a

conspiracy under the standards applicable to 12(b)(6) motions to dismiss.  (See Pls.' Opp'n

Mem. at 22-23 (citing to post-settlement conduct allegations in the First Amended Complaint

and Confidential Appendix).)  Consequently, the court need not determine whether the pre-

settlement conduct allegations may be considered.

### e. **Antitrust Injury and Antitrust Standing**

Antitrust injury is a component of antitrust standing, which is a concept wholly separate

from traditional standing under the United States Constitution.  Abraham v. Intermountain Health

Care, Inc., 461 F.3d 1249, 1267 (10th Cir. 2006).  Antitrust standing essentially derives from the

Clayton Act, which defines who may maintain an antitrust action for damages or injunctive

relief, and from decisions by the United States Supreme Court.  See Associated Gen. Contractors

of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 529 (1983); Sports Racing Servs.,

Inc. v. Sports Car Club of America, Inc., 131 F.3d 874, 881 (10th Cir. 1997).  The Tenth Circuit

decision in Sports Racing Services contains a very good description of antitrust standing.  See

also, e.g., Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) (discussing

antitrust injury).

Courts apply a two-prong test to determine whether a plaintiff has antitrust standing.

To maintain standing to bring an antitrust claim under § 4 of the Clayton Act, 15
U.S.C. § 15 [providing for treble damages], a plaintiff must show (1) an
"**antitrust injury**;" and (2) a **direct causal connection** between that injury and a

17

> defendant's violation of the antitrust laws. . . .  To meet the first prong, [plaintiffs]
> must allege a business or property injury, an antitrust injury, as defined by the
> Sherman Act.  An antitrust injury is defined as an injury of the type the antitrust
> laws were intended to prevent and that flows from that which makes defendants'
> acts unlawful. . . .  To establish the second prong of antitrust standing, [plaintiffs]
> must show the antitrust injury resulted directly from [defendants'] violation of
> antitrust law.

Sports Racing Servs., 131 F.3d at 882 (internal quotations omitted; emphasis added) (providing

non-exhaustive list of factors to consider when evaluating antitrust standing).  Antitrust laws

were intended to prevent injury to competition, not injury to competitors.  Brunswick Corp. v.

Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977);  Tal v. Hogan, 453 F.3d 1244, 1257-58

(10th Cir. 2006) ("The primary concern of the antitrust laws is the corruption of the competitive

process, not the success or failure of a particular firm.") (citing Brunswick Corp.).

Comdata contends that Flying J has not alleged antitrust injury because the effects of the

alleged conspiracy actually would benefit Flying J by hurting its rivals (other truck stops).

Comdata also argues that Flying J and TON have not alleged antitrust standing because they do

not compete in the relevant market (truck fleet cards) and their alleged injuries (lost sales) are

indirect and too remote from the alleged restraint of competition.

First, the court finds that Flying J has established antitrust injury (that is, a business or

property injury that the antitrust laws were intended to prevent and that flows from the alleged

anticompetitive conduct of the Defendants).  The network effects of the two-sided market shows

how interconnected the parties, their businesses, and their markets are.  See, e.g., Blue Shield of

Virginia v. McCready, 457 U.S. 465, 483-84 (1982) (holding that "although [Plaintiff] was not a

competitor of the conspirators, the injury she suffered was inextricably intertwined with the

injury the conspirators sought to inflict on [the relevant] market" and that her injury was the type

Congress intended to address by the antitrust laws); Reazin v. Blue Cross & Blue Shield of

Kansas, Inc., 899 F.2d 951, 963 (10th Cir. 1990) ("[A]n antitrust plaintiff need not necessarily be

a competitor or consumer.") (citing McCready).  The First Amended Complaint alleges the

negative "network effects" of Comdata's two-tiered pricing strategy in the two-sided market (one

side is the truck stop market, which Flying J directly competes in).  An antitrust injury must be

"attributable to an anticompetitive aspect of the practice under scrutiny."  Atlantic Richfield v.

USA Petroleum Co., 495 U.S. 328, 334 (1990).  Although there may be a small "benefit" to

Flying J, the overall harm is much more substantial, and the allegations establish that Flying J's

loss of customers and diesel fuel sales is attributable to the anticompetitive actions alleged in the

First Amended Complaint.

Second, the court finds that Flying J and TON have established antitrust standing.  Flying

J participates in the Trucker Fuel Card Market as a consumer, and consumers are favored as

antitrust plaintiffs.  Also, TON's injury is "inextricably intertwined with the injury the

conspirators sought to inflict" on market participants.  See McCready, 457 U.S. at 484.  (See also

Pls.' Opp'n Mem. at 27-31 (persuasively analyzing allegations under the factors set forth in

Elliott Indus. Ltd. P'ship v. BP America Prod. Co., 407 F.3d 1091, 1124 n.31 (10th Cir. 2005),

and Abraham, 461 F.3d at 1268).)

**f.    Does *Per Se* Analysis Apply to Allegations of Illegal Restraint?**

To determine whether an alleged restraint of trade is unreasonable (i.e., illegal) under

Sherman Act § 1 (a reasonable restraint of trade is not actionable), the court applies either a "per

se" analysis or a "rule of reason" analysis.  The Tenth Circuit decision in Gregory v. Fort Bridger

Rendezvous Ass'n, 448 F.3d 1195 (10th Cir. 2006), provides a thorough description of the two

modes of analysis.

The Plaintiffs allege that the Defendants' conduct is illegal under both a per se analysis and a rule of reason analysis.  Comdata contends that the per se rule is not applicable here because the alleged conspiracy contains a vertical agreement (for which a per se analysis is prohibited under Tenth Circuit law) and does not rise to the level of egregiousness required to apply the per se rule.

The presumption is that the "rule of reason" analysis applies to a court's analysis of whether defendants' conduct unreasonably restrains trade.  Diaz v. Farley, 215 F.3d 1175, 1182 (10th Cir. 2002).

> [The rule of reason approach] requires the factfinder to weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.  _Per se_ analysis is reserved for agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

Id. (emphasis added).

Some group boycotts have been deemed per se illegal, but not all.  See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 290, 293-94 (1985) ("not every cooperative activity involving a restraint or exclusion will share with the per se forbidden boycotts the likelihood of predominantly anticompetitive consequences."); Gregory, 448 F.3d at 1203-04 (per se approach "'has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.'") (quoting FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 458 (1986)).

Cases to which the U.S. Supreme Court has applied the _per se_ approach have

generally involved joint efforts by a firm or firms to disadvantage competitors by
"either directly denying or persuading or coercing suppliers or customers to deny
relationships the competitors need in the competitive struggle."  In these cases, the
boycott often cuts off access to a supply, facility, or market necessary to enable
the boycotted firm to compete, and frequently the boycotting firms possessed a
dominant position in the relevant market.

Northwest Wholesale Stationers, 472 U.S. at 294 (internal citations omitted).

The Northwest Wholesale Stationers description of per se illegal boycotts resembles the

boycott alleged in the Plaintiffs' First Amended Complaint.  The Plaintiffs allege that Comdata

(who has a dominant position in the fleet card market) provides a *quid pro quo* to TA and Pilot

(who, in combination, hold a dominant position in the truck stop market) by charging TA and

Pilot much lower transaction fees in exchange for TA's and Pilot's boycott of the TCH Card.  By

refusing to accept the TCH Card, TA and Pilot cut off access to the dominant fuel card

processing technology— Comdata's Trendar POS system—which in turn cuts off access to an

entire section of the market for fleet cards and diesel fuel and other services typically provided by

travel plazas.  Moreover, Plaintiffs allege that Comdata uses its market power to financially

punish truck fleets and truck stops (typically independent truck stops) who use or accept the TCH

card.  This is akin to denial of access to a facility that TCH and independent truck stops need to

compete.  The allegations, taken as true, fall within the requirements of a per se rule.

The other hurdle that the Plaintiffs must clear to salvage their *per se* theory of liability is

the Tenth Circuit rule that a vertical group boycott is, as a matter of law, not subject to the *per se*

rule.  See Coffey v. Healthtrust, Inc., 955 F.2d 1388, 1392 ("In this circuit, to establish that a

group boycott is *per se* illegal 'there must be an agreement among conspirators whose market

positions are horizontal to each other.'") (quoting Westman Comm'n Co. v. Hobart Int'l, Inc.,

21

796 F.2d 1216, 1224 n.1 (10th Cir. 1986)).  "While the competitors need not be at the same

market level as the plaintiff, there must be concerted activity between two or more competitors at

the same market level."  Key Financial Planning Corp. v. ITT Life Ins. Corp., 828 F.2d 635, 641

(10th Cir. 1987).

      Comdata contends that because Comdata's relationship with TA and Pilot is vertical, the

Plaintiffs' per se theory fails as a matter of law.  But the case law is not completely clear on this

issue.  Here, Plaintiffs have alleged a horizontal boycott of TCH by TA and Pilot (competitors in

the same market and on the same market level).  But the conspiracy also has a vertical

component to it (Comdata's quid pro quo with TA and Pilot).  The court is not convinced that

Comdata's presence in the alleged agreement is sufficient to nullify a *per se* analysis.  Comdata is

not boycotting TCH; TA and Pilot are.  Comdata facilitates the boycott by TA and Pilot.  The

court finds that the rule stated in Coffey does not apply here, because the concerted activity

includes "two or more competitors at the same market level," as Key required.  See NYNEX

Corp. v. Discon, Inc., 525 U.S. 128, 136 (1998) (holding that precedent in Klor's, Inc. v.

Broadway-Hale Stores, Inc., 359 U.S. 207 (1959), "makes the per se rule inapplicable [in] the

case before us [because it] concerns only a vertical agreement and a vertical restraint[.]")

(emphasis added).

## CONCLUSION

      Given the detailed First Amended Complaint and the Confidential Appendix incorporated

into it, Comdata and Pilot cannot prevail on their motions to dismiss.  The allegations are

extensive and must be taken as true.  Ultimately, the Plaintiffs have the better arguments at this

stage, and so the motions to dismiss are denied, with the exception that the claims under state

antitrust acts other than Utah's antitrust act are dismissed.

**ORDER**

For the foregoing reasons, Comdata Network, Inc.'s Motion to Dismiss the Amended Complaint, or, in the Alternative, Strike All Allegations of Pre-Settlement Conduct pursuant to Fed. R. Civ. P. 12(f) (Docket Entry No. 346) is DENIED, with the exception that the request to dismiss all claims under non-Utah antitrust statutes is GRANTED.  Similarly, the Pilot Defendants' Motion to Dismiss First Amended Complaint (Docket Entry No. 354) is DENIED, with the exception that the request to dismiss all claims under non-Utah antitrust statutes is GRANTED.

SO ORDERED this 14th day of November, 2008.

BY THE COURT:

TENA CAMPBELL
Chief Judge